SAMUEL B. O. WILSON, ¡APPELLANT, VS. HENRY L.
    MITCHELL, GOVERNOR, W. B. LAMAR ATTORNEY-
    GENERAL W. D. BLOXHAM, COMPTROLLER, C. B.
    COLLINS, TREASURER, AND L. B. WOMBWELL, COM-
    MISSIONER OF AGRICULTURE, SUED AS THE TRUS-
    TEES OF THE INTERNAL IMPROVEMENT FUND OF
    THE STATE OF FLORIDA, APPELLEES.

1.  Circuit Courts have power in their discretion to permit to be
    filed and appended to pleas in equity the affidavit and cer-
    tificate required by Equity Rule No. 48, at any time before a
    decree pro confesso for want of a plea is entered, where the
    omission to do so was caused by inadvertence or oversight
    on the   part of the pleader, and the application is promptly
    or seasonably made.

2.  The Internal Improvement Fund designated in section 1 and
    vested in the Trustees by section 2 of the Internal Improve-
    ment Act (Chap. 610, laws, approved January 6, 1855) is in no
    manner made or intended to be made responsible to the
    holders of bonds issued by railroad companies under authority
    of that act, further than for interest accruing on the bonds
    up to their maturity; nor can such fund be held liable for
    the neglect of the trustees to collect semi-annually the in-
    stallments due to the special sinking funds provided by that
    act for the payment of the principal of such bonds, nor for
    the failure of the trustees to account for moneys paid into
    such sinking funds and misappropriated by them.

3.  The trustees had power under section 3 of the Internal Im-
    provement Act (Chap. 610, laws, approved January 6, 1855)
    to apply money derived from the sale of railroad property
    made under the authority of that section, to the purchase and
    cancelling of outstanding bonds of the railroad company or
    to incorporate it with the sinking fund provided by that act;
    and they were not required to hold the bonds so purchased
    as an investment on account of the sinking fund upon which
    interest was to continue for the benefit of that fund; and
    upon the cancellation of such bonds so purchased. interest
    would cease to run thereon, unless the interest coupon had
    been previously detached and negotiated.

4.  Under section 3 of the Internal Improvement Act( Chap. 610,
    laws, approved January 6, 1855) the trustees were invested

with a discretion either to purchase and cancel bonds issued by a railroad company with the purchase money derived from the sale of such road by them under authority conferred by that section, or to incorporate it with the sinking fund provided by that act, and if they exercised the discretion to purchase and cancel bonds, they were not required to purchase all bonds then outstanding, but only as many as they deemed advisable.

5. Ordinarily where a plea in equity is set down for argument, its truth is admitted only for the purpose of testing its legal sufficiency. The judgment to be entered upon the allowance of such a plea upon argument is not definitive, for its truth may be denied by the plaintiff by replication, and the parties may then proceed to examine witnesses, the one to prove, the other to disprove the facts stated in the plea, and no order of the court merely passing upon the legal sufficiency of the plea should preclude the plaintiff the right thus to controvert the truth of the facts alleged.

Appeal from the Circuit Court for Leon County.

The facts of the case are stated in the opinion of the court.

*W. B. Young* and *W. H. Baker*, for Appellant.

*Geo. P. Raney* for Appellees.

CARTER, J.

A bill in equity was filed September 14, 1895, in the Circuit Court of Leon Cocunty by Samuel B. O. Wilson, suing in behalf of himself and other holders of certain bonds who might come in, prove their claims and share in the costs of litigation, against Henry L. Mitchell, Governor of the State of Florida, William B. Lamar, Attorney-General of said State, W. D. Bloxham, Comptroller of said State, C. B. Collins, Treasurer of said State,

L. B. Wombwell, "who," the bill alleges, "are sued as the trustees of the Internal Improvement Fund of the State of Florida, a body corporate created and existing under the laws of Florida." The bill alleges that complainant is the owner of two bonds for $1,000 each issued by the Florida, Atlantic & Gulf Central R. R. Co., on April 26, 1859, in accordance with the provisions of the Internal Improvement Act, and that said bonds were part of an issue of like tenor and date limited to $10,000 per mile of said road, and that the Internal Improvement Fund was especially charged with the payment of the interest coupons attached to the bonds; that the railroad company paid to the Trustees of the Internal Improvement Fund for several years after said issue of bonds large sums as a sinking fund, for the redemption thereof, the precise amount being unknown to complainant; that in 1868 said railroad company having made default in the payments to said trustees as required by the terms of said internal improvement act, they caused the roadbed, iron, equipments, workshops, depots and franchises of said company to be seized and sold for payment of the arrears then due to the sinking fund, said sale being made in accordance with the provisions of section 3 of said act; that they received the sum of $111,000 from said sale, $83,200 of which they invested in the purchase of bonds of said company of the issue before mentioned with coupons attached; that said trustees then purchased all of said bonds except twenty-nine, and that twenty-one or twenty-two are still outstanding, seven having been subsequently purchased by the trustees; that after said sale the railroad company ceased to have any organization or corporate existence and its property and fran-

chises passed into the hands of another corporation and was operated by said last named corporation and its successors down to October, 1885, when it went into the hands of a receiver of the United States Court; that for five or six years last passed said railroad property has been owned and operated by the Florida Central & Peninsular R. R. Co.; that from the date of the sale of said road in March, 1868, down to its seizure by a Receiver of the United States Court on the first day of October, 1885, no attempt was made by the Trustees to enforce on the part of the owners of said road the payment of one-half of one *per cent.* semi-annually, to the sinking fund as required by section 3 of said act, nor have they ever attempted to annul said contract of purchase as it was their duty to do, in case of failure to make said payments; that by the terms of section 2 of said act the individual property of each of the directors of the Florida Atlantic & Gulf Central R .R. Company was made liable in an action of debt to said Trustees for the amount due and unpaid with twenty *per cent.* interest until paid, but said trustees have never sought to hold the individual property of said directors liable; that the only effort ever made by said trustees since the sale in 1868 to discharge the duties imposed upon them by the law under which said bonds were issued and which said duties were prescribed for the protection of the holders of said bonds, was the commencement of a suit in chancery in the Circuit Court of Duval county, on February 19, 1889, against the Florida Central & Peninsular R. R. Co., the present owners of the road, and said suit has been permitted to drag along ever since and never has been brought to a hearing; that said bonds were due and

payable on September 1, 1892, and if the trustees had discharged their duties in accordance with the provisions of said act from the time of their issue until the time they became due and payable, they would have been in possession of ample funds to have paid all of said outstanding bonds, when the same became due; that appellant demanded payment from said trustees of his said bonds, and on July 16, 1895, they paid his $319.17 upon each but refused to pay the balance, and that the balance of the principal, with interest from September 1, 1892, still remains unpaid.

The bill prays that an account be taken as to what is due appellant and such other holders of the same issue of bonds as may come in, make themselves parties and prove their claims, and that an account be taken of the sinking fund in the hands of the trustees or which should be in their hands if the trustees had discharged their duties in accordance with the provisions of said act and that the trustees be required to pay the balance of the principal and overdue interest upon the bonds of appellants and all other bonds of that issue outstanding whose owners should come in, prove their claims and share in the costs of the suit, and for general relief. A copy of one of the appellant's bonds was attached and made part of the bill.

On December 2, 1895, a paper purporting to be the plea of Henry L. Mitchell, Governor; William D. Bloxham, Comptroller; C. B. Collins, Treasurer; Lucius B. Wombwell, Commissioner of Agriculture, and William B. Lamar, Attorney-General, of the State of Florida, as Trustees of the Internal Improvement Fund of said

State, to the whole bill was filed, which alleges that the
parties named were the Trustees of the Internal Im-
provement Fund, each being such trustee in and by
virtue of the said several offices held by them respect-
ively, and not otherwise; that the said Bloxham had been
Comptroller since May 1, 1890, Wombwell, Commis-
sioner of Agriculture, and Lamar, Attorney-General,
since the first Tuesday after the first Monday in Jan-
uary, 1889, and Mitchell, Governor, and Collins, Treas-
urer, since the first Tuesday after the first Monday in
January, 1893; Bloxham, Wombwell and Lamar having
each begun a second term of their respective offices on
the day last mentioned; that all of the Florida, Atlantic
& Gulf Central R. R. bonds purchased by the Trustees of
the Internal Improvement Fund at any time with said
$111,000, or any part thereof, were cancelled under the
provisions of the third section of the act of the legislature
mentioned in the bill, except seven of the twenty-nine
bonds mentioned in the bill, said seven bonds having
been purchased between February 4th, 1882, and May
18th, 1884, with a part of a balance of $5,000 of said
$111,000, by predecessors of defendants in said trust and
incorporated by them into the sinking fund of the then
outstanding twenty-nine Florida, Atlantic & Gulf Central
Railroad bonds; that said seven bonds and the other in-
vestments made of said $5,000 and the income from such
investments are all the assets or funds which have at any
time been received or held by defendants applicable to
the payment of the principal of said outstanding Florida,
Atlantic & Gulf Central Railroad Company bonds,
and the payment made by defendants as stated
in the bill on each of the bonds now sued on

by complainant was 1-22 of the entire amount of all of such investments, and the income therefrom over and above the mere principal of the said seven bonds, and similar payments had been made long prior to the commencement of the suit on nineteen other of said twenty-two bonds, such payments having been made about the same time as the payments on the two bonds sued upon; that defendants neither hold nor have ever held any other funds or other property belonging to or constituting a part of the sinking fund of said Florida, Atlantic & Gulf Central R. R. bonds, or applicable to the payment of the principle of said bonds, nor any property applicable to any interest accruing on said bonds since the maturity thereof. To this instrument was attached an affidavit from the parties in whose behalf it was filed, to the effect that the plea was true in point of fact.

. On December 11, 1895, appellant moved to strike the plea and for a decree *pro confesso,* on the ground that it was not supported by the affidavits of defendants that it was not interposed for delay and accompanied by the certificate of counsel that in his opinion it was well founded in law. On the same day defendants filed the certificate of counsel and affidavits of defendants, the omission of which was made the basis of the motion to strike the plea, and on December 18, 1895, after notice given to appellant, moved the court for leave to file and append to the plea the certificate of counsel and affidavit mentioned, supporting the application by the affidavit of counsel who prepared the plea to the effect that the omission to file with the plea the affidavit and certficate required by the rule of court was attributable solely to his oversight, and was not made with any purpose to evade

the requirements of the rule, or to delay or embarrass the cause. On December 18, 1895, the motion of defendants was granted and complainant's motion to strike the plea and enter a decree *pro confesso* was denied. On December 31, 1895, complainant directed the clerk to enter an order setting down the plea to be argued. On February 12, 1896, defendants gave notice of a hearing upon the plea, and on March 12, 1896, a final decree was entered, that the plea be sustained and allowed and that the bill be dismissed at complainant's cost. From this decree complainant entered this appeal, and assigns as error the rulings of the court denying the motion to strike the plea and for a decree *pro confesso,* granting the motion to file and append to the plea the certificate and affidavit, and the final decree allowing and sustaining the plea and dismissing the bill.

Equity rule No. 48, so far as applicable to pleas, provides that no plea shall be allowed to be filed to any bill unless upon a certificate of counsel that in his opinion it is well founded in point of law and supported by the affidavit of defendant (or in certain cases by his agent or attorney) that it is not interposed for delay and that it is true in point of fact. The paper purporting to be a plea filed December 2, 1895, was not sworn to nor certified as required by this rule and complainant might have ignored it, treating it as no plea and entered a decree *pro confesso* for want of a plea, had he desired so to do. Trower v. Bernard, 37 Fla. 226, 20 South. Rep. 241. Complainant did not pursue that course, but moved to strike the plea and for a decree *pro confesso.* Before this motion was acted upon defendants filed the affidavit and certificate required by the rule and moved for leave

to file and append to the plea the proper affidavit and certificate. It was in the discretion of the Circuit Judge to permit this to be done under the circumstances of this case, as no decree *pro confesso* had been entered, the application was promptly made and the omission was shown to have resulted from inadvertence or oversight on the part of the pleader. As the ruling granting this motion is free from error, it necessarily results that complainant's motion to strike was properly overruled.

Two questions remain for our determination, to-wit: Whether the plea was properly allowed upon argument, and whether the bill was properly dismissed. The first of these questions depends upon a consideration of the provisions of the Internal Improvement Act, Chap. 610 laws, approved January 6, 1855, under which the bonds mentioned in the bill were authorized to be issued. Nearly all of the provisions of that act affecting this question are set forth in the opinion in Hawkins v. Mitchell *et al.,* 34 Fla. 405, 16 South. Rep. 311, and we shall not here repeat them in detail, though it will be proper to quote in full some of them. Some of the duties of the Trustees created by that act are prescribed by section 2 in the following language: "to pay out of said fund agreeably to the provisions of this act, the interest from time to time, as it may become due on the bonds to be issued by the different railroad companies under the authority of this act; also to receive and demand semi-annually, the sum of one-half of one per cent. (after each separate line of railroad is completed) on the entire amount of the bonds issued by said railroad company, and invest the same in stocks of the United States, or State securities, or in the bonds herein provided to be

issued by said company. Said trustees shall also invest
the surplus interest of said sinking fund investment as it
may accrue. Said trustees shall also demand and re-
ceive from each railroad company named in this act, the
amount due to the Internal Improvement Fund from
said railroad company according to the provisions here-
in contained on account of interest on the bonds issued
by said company, and a refusal or neglect on the part
of the President and Directors of any railroad company
herein named to comply with the provisions of this act
as to payment to said Trustees of the amount due and
payable to the fund as provided in sections 11, 12 and 13
on account of interest and sinking fund, the individual
property of each and all the Directors shall be liable in an
action of debt to said Trustees for the amount due and
unpaid, with 20 per cent. interest until paid." Section
3 contains the following provision: "All bonds issued by
any railroad company under the provisions of this act
shall be a first lien or mortgage on the road-bed, iron,
equipment, workshops, depots and franchise; and upon
a failure on the part of any railroad company accepting
the provisions of this act to provide the interest as herein
provided on the bonds issued by said company, and the
sum of one per cent per annum as a sinking fund as herein
provided, it shall be the duty of the Trustees, after the
expiration of thirty days from said default or refusal, to
take possession of said railroad and all its property of
every kind and advertise the same for sale at public auc-
tion to the highest bidder, either for cash or additional
approved security as they may think most advantageous
for the interest of the Internal Improvement fund and
the bondholders. The proceeds arising from such sale

shall be applied by said Trustees to the purchase and cancelling of the outstanding bonds issued by said defaulting company, or incorporated with the sinking fund. Provided that in making such sale, it shall be conditioned that the purchasers shall be bound to continue the payment of one-half of one per cent. semi-annually to the sinking fund until all the outstanding bonds are discharged under the penalty of an annulment of the contract of purchase and the forfeiture of the purchase money paid in." Section 12 provides "that every railroad company accepting the provisions of this act shall, after the completion of the road, pay to the Trustees of the Internal Improvement Fund at least one-half of one per cent on the amount of indebtedness or bond account every six months as a sinking fund to be invested by them in the class of securities named in section 2 or to be applied to the purchase of the outstanding bonds of the company, but it shall be distinctly understood that the purchase of said bonds shall not relieve the company from paying the interest on the same, they being held by the Trustees as an investment on account of the sinking fund."

It is perfectly clear from the provisions of the entire act that the Internal Improvement Fund designated in section 1, and vested in the Trustees by section 2, is in no manner made, or intended to be made, responsible to the holders of bonds issued by railroad companies under authority of that act further than for interest accruing on the bonds up to their maturity, for which the fund was specially pledged, and which the Trustees were required to pay. It is not claimed in this case that any interest on the bonds accruing prior to their maturity remained unpaid. The principal sum of the bonds was

provided for, not out of the fund proper, but from a special sinking fund to be collected semi-annually by the Trustees and invested by them, and by a statutory first lien or mortgage upon the road-bed, iron, equipments, workshops, depots and franchises of the company issuing the bonds to be enforced by the Trustees. The moneys derived by the Trustees from such sale, and the moneys paid in to them as a sinking fund, did not become a part of the Internal Improvement Fund proper, but remained separate and distinct, and held for trust purposes entirely different. Nor is there any language in the act from which the Internal Improvement Fund proper can be held liable for the neglect of the Trustees to collect semi-annually the installments due to the sinking fund, nor for their failure to account for moneys paid into that fund and misappropriated by them. The bondholder had a right to compel the Trustees to discharge any duty under the statute designed for his benefit by appropriate legal proceedings, and to enjoin them from misappropriating funds to which the bondholder was entitled to look for his payment; and it may be that he can recover against the Trustees individually for their neglect of duty whereby the fund designed by the statute for his payment is not collected, or whereby it is misappropriated. The Internal Improvement Fund is a public fund vested in the Trustees for certain specified purposes, and can not be diverted to other purposes or made responsible for damages accruing to holders of the railroad bonds caused by the neglect of duty on the part of the Trustees.

A careful consideration of the entire Internal Improvement Act, and the decisions construing it (Trustees

Internal Improvement Fund v. Bailey, 10 Fla. 112, S. C. 81 Am. Dec. 194; State of Florida v. Anderson, 91 U. S. 667; Vose v. Reed, 54 N. Y. 657), satisfy us that the views above expressed are entirely correct, and this is true even though we were to concede that the Trustees are a body corporate as contended for by appellant, for if the Trustees are a body corporate, the trust estate in its hands can not be made liable except as provided in the statute any more than it can be made liable in the hands of an individual trustee under a like trust. The purpose of the present bill, in part, is to subject the Internal Improvement Fund proper to the payment of the outstanding bonds mentioned in the bill, upon the ground that former Trustees failed to discharge certain duties, the performance of which would have placed in their hands to the credit of the sinking fund a sum sufficient to pay the principal of the bonds at maturity and the interest subsequently accruing. It is alleged that from the date of the sale of the road in March, 1868, no attempt was made to collect the semi-annual payments due the sinking fund, nor to annul the sale of 1868, nor to enforce the personal responsibility of the directors of the road issuing the bonds, and for these neglects of duty it is sought to hold the fund liable. This, as we have said, cannot be done. Conceding, for the purposes of this case, that former Trustees would be personally liable in a suit against them by the bondholders for these neglects of duty, the fund in their hands or in the hands of their successors can not be subjected to liability on that account, nor can the fund in the hands of the defendant Trustees be made responsible for their own neglect of duty. There are some allegations in the bill which tend to show a neg-

lect on the part of defendant Trustees to perform duties
devolving upon them with respect to the collection of
moneys due to the sinking fund, but those allegations are
very general and indefinite, and were evidently not
framed with a view to subject these Trustees to individual
liability for such neglect. The bill does not pray a per-
sonal decree against them on that account, nor do counsel
for either party claim that the bill is sufficient in its alle-
gations to sustain a personal decree against the defend-
ant Trustees for their own neglect of duties, even if they
can legally be held personally liable for such neglect. As
to the other features of the bill we think the plea is a
complete answer. It shows that complainant has re-
ceived all that is due him from the sinking fund which
came to the defendants' hands. It is claimed, however,
that the Trustees who purchased the bonds with $83,200
of the money derived from the sale of the road in 1868,
had no power to cancel them with the interest coupons at-
tached, but that they should have purchased the bonds as
an investment for the sinking fund, and that as the In-
ternal Improvement Fund proper was liable for the in-
terest on these bonds, which was never paid, the de-
fendant Trustees should now be compelled to pay that in-
terest into the sinking fund from the Internal Improve-
ment Fund proper and account therefor to the holders
of the outstanding bonds. The money with which these
bonds were purchased was derived from the sale of
the property under the power conferred by section 3
of the act, and that section expressly authorized the
Trustees to apply it to the purchase and cancelling of out-
standing bonds, or to incorporate it with the sinking
fund. It did not require the bonds so purchased to be

held as an investment on account of the sinking fund upon which interest was to continue for the benefit of that fund, as was the case with bonds purchased with moneys due the sinking fund under the powers conferred by section 12, but expressly authorized them to be cancelled, and of course when cancelled they would cease to bear interest unless the statute otherwise directed, or unless the coupons had been detached and negotiated, which was not the case here. The Trustees were invested with a discretion either to purchase and cancel bonds with the purchase money derived from the sale, or to incorporate it with the sinking fund, and if they exercised the discretion to purchase and cancel bonds, they were not required to purchase all then outstanding, but only as many as they deemed advisable. State of Florida v. Anderson, 91 U .S. 667.

It is argued that the plea does not account for the entire $111,000 received by the Trustees at the sale made in 1868, but only for about $87,000. The plea does allege that complainant has received his proportion of all the money and assets due the sinking fund which ever came into the hands of the defendant Trustees, and, as we have shown, this is a sufficient answer to the present bill for the reason that the Internal Improvement Fund proper can not be held responsible for moneys due the sinking fund by the Trustees, nor can the present Trustees be held accountable for moneys received for that fund by former Trustees, but which never came to their hands unless they can be held personally liable in an action charging them with neglect of duty in failing to collect from their predecessors, which is not sought to be done in this case .

The Circuit Court properly allowed the plea upon argument, but erred in dismissing the bill without giving complainant the opportunity of filing a replication denying the truth of the plea or an opportunity to apply for leave to amend the bill . There is no circumstance here tending to show that the hearing was had as to the truth of the plea, or that it was admitted by appellant to be true. Ordinarily, where a plea is set down for argument, the truth is admitted only for the purpose of testing its legal sufficiency. The judgment to be entered upon the allowance of a plea upon argument is not definitive, for its truth may be denied by the plaintiff by replication, and the parties may then proceed to examine witnesses, the one to prove, the other to disprove, the facts stated in the plea, and no order of the court in merely passing upon the legal sufficiency of the plea should preclude the plaintiff the right thus to controvert the truth of the facts alleged. Rouskulp v. Kershner, 49 Md. 516; Mitford's & Tyler's Pleadings & Practice in Equity, 112-390; Story's Equity Pleadings, section 697; 1 Daniell's Chy. Pl. & Pr., *696-7. See, also, United States v. Dalles Military Road Co., 140 U. S. 599, 11 Sup. Ct. Rep. 988. In Crump v. Perkins, 18 Fla. 353, the court say: "Under rules 52 and 55 of the rules governing courts of equity, this plea should have been replied to by plaintiff or set down for argument by the rule day next succeeding the rule day on which it was filed, and if allowed upon the hearing the defendant would have been entitled to his costs, and unless leave to file replication to plea was asked for or the court otherwise ordered, the decree was final." In that case there were ample facts shown by the record to justify the trial court

upon the hearing to presume not only that the plaintiff did not wish to reply to the plea if allowed upon argument, but that he desired the action of the court to be final, and it was upon that ground that this court held that the court did not err in dismissing the bill upon the hearing without giving plaintiff an opportunity to reply. In view of this fact and the other remarks of the court regarding the ruling then being considered in that case, we are satisfied that the court did not intend to hold that it was proper to dismiss the bill upon the hearing of a plea thereto set down for argument, without giving an opportunity to reply, except in cases where it affirmatively appeared that plaintiff did not desire to deny the truth of the plea.   In Hawkins v. Mitchell, *supra,* where a plea to the whole bill was set down for argument, the Circuit Court upon the hearing allowed and sustained the plea and dismissed the bill.   No point was made in this court as to the practice pursued in that case, and the decree was affirmed without reference to that question. In this case the appellant insists that the bill should not have been dismissed without giving an opportunity to amend, and we think the proper practice is as indicated above.

The final decree, in so far as it allows the plea, is affirmed; in other respects it is reversed, and the cause remanded for further proceedings consistent with this opinion and equity practice.