DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**PEGAH JONES,** as Personal Representative of the
**ESTATE OF ARSHIA POURSARTIP,** deceased,
Appellant,

v.

**BLUE RIDGE MANUFACTURING, LLC,** a Foreign Limited Liability
Company, and **RAYSIDE TRUCK & TRAILER, INC.,**
a Florida Corporation, citizen, and resident,
Appellees.

Nos. 4D21-1799 and 4D21-2371

[December 14, 2022]

Consolidated appeals from the Circuit Court for the Fifteenth Judicial
Circuit, Palm Beach County; James Nutt, Judge; L.T. Case No. 50-2019-
CA-012709-XXXX-MB.

Julie H. Littky-Rubin of Clark, Fountain, La Vista, Prather & Littky-
Rubin, LLP, West Palm Beach, for appellant.

Michael J. Pedowitz and Gary F. Baumann of Baumann, Gant & Keeley,
P.A., Fort Lauderdale, for appellee Blue Ridge Manufacturing, LLC.

Carri S. Leininger of Williams, Leininger & Cosby, P.A., North Palm
Beach, for appellee Rayside Truck & Trailer, Inc.

CIKLIN, J.

This matter arises from a wrongful death case. Pegah Jones, as
Personal Representative of the Estate of Arshia Poursartip ("the Plaintiff"),
appeals a final judgment in favor of Rayside Truck & Trailer, Inc., and Blue
Ridge Manufacturing, LLC ("Blue Ridge") (collectively, "the Defendants"),
and an order denying her renewed motion for a directed verdict and a new
trial. Additionally, Blue Ridge appeals an order granting its motion for
entitlement to tax costs but denying its motion for entitlement to attorneys'
fees. Neither party has presented reversible error, and so we affirm on
both appeals.

The decedent died in an accident in which his Mercedes vehicle spun sideways and struck the back of a stationary Ford F-550. The truck weighed nearly six times as much as the Mercedes and was hauling granite slabs at the time. The Plaintiff conceded that the decedent caused the accident, as it was raining, and the decedent was speeding and driving on bald tires. However, the Plaintiff argued that the decedent's death was caused by the truck's "underride guard," a device meant to keep a car from sliding under the bed of a large truck in the event of an accident. She contended the Defendants either placed the underride guard on the market with a defect or negligently installed or manufactured the underride guard.

By order of the trial court, the parties entered into a pretrial stipulation and agreed that the decedent died as a result of the injuries he sustained in the accident, stating as follows:

> 13. [The decedent]'s fatal injury was a transverse basal skull fracture which caused a fatal concussion *due to direct or indirect contact* with the flatbed of the Ford F-550.

> 14. [The decedent] sustained a right-sided mandibular fracture *as a result of direct or indirect contact* with the flatbed of the Ford F-550.

(Emphasis added).

Despite these stipulations, the parties would later—shortly before trial—dispute the meaning of "direct or indirect contact" as used in the stipulation. Paraphrased and summarized: the Plaintiff sought to present a theory that the decedent's basal skull fracture was caused by an impact to the decedent's head, either by the flat bed or by another object in or on the vehicle, whereas the Defendants theorized that the basal skull fracture may have been caused by either impact/contact *or* forces of high velocity followed by rapid deceleration so violent that it caused a fracture at the base of the skull despite nothing directly contacting the decedent's head (e.g., the fatal injury believed by some to have been suffered by racecar driver Dale Earnhardt.)

With respect to the experts who opined regarding cause of death, in their depositions, they generally opined that the cause of death (basal skull fracture) likely involved contact or a direct impact, or at a minimum conceded that such a scenario was possible. However, the Plaintiff's non-retained expert, Dr. Juste, and one of the Defendants' experts, Dr. Rentschler, also acknowledged that other scenarios, such as the Dale

2

Earnhardt-type deceleration injury, were possible or could not be conclusively ruled out in the absence of an internal autopsy, which was not conducted in the instant matter.

During a hearing on a motion in limine regarding how experts would be permitted to testify regarding cause of death, it became apparent that the pretrial stipulation notwithstanding, the parties never had a clear agreement or understanding as to the meaning of "direct or indirect contact." Consequently, one week before trial, the Defendants filed a notice of withdrawal of the two pretrial stipulation facts listed above, citing "irreconcilable differences as to the interpretation of the facts asserted therein."

The trial court heard argument on the notice of withdrawal just prior to opening statements at trial. At the hearing, the Plaintiff asked for an order precluding the attorneys from mentioning Dale Earnhardt or a Dale Earnhardt injury. The trial court ruled, "I'm not going to let them withdraw the stipulation at this late hour. People want to nuance it and explain to the jury what it means, that's fine." The trial court further indicated that a proper predicate must be laid for testimony about Dale Earnhardt.

At trial, when asked on direct examination about "direct versus indirect contact in this case," one of the Plaintiff's experts was the first to describe a Dale Earnhardt injury. He testified as follows:

> Right. There are certain injuries will happen only because you have a direct blow. Like jaw fracture. You cannot accelerate the head fast enough to do anything to the jaw. But you have to hit it. That's how it happens.
>
> Now, basal skull fracture can happen due to inertia loading. The race car driver I mentioned to you last night was, long time ago sustained basal skull fracture. He had the race harnesses, hit the wall, very high change in velocity.
>
> And the basal skull fracture occurred. So basal skull fracture can happen due to inertia but of to have a very high accelerations.

Similar testimony followed from defense experts, with the jury ultimately returning a defense verdict.

This appeal follows. The Plaintiff argues that the trial court erred by allowing testimony and argument to "nuance" the meaning of the

stipulations at issue, which testimony effectively contravened the stipulations in question. The Defendants argue that, because the stipulations were ambiguous, the trial court did not err by permitting the parties to argue and present evidence on their respective interpretations of the stipulations. We agree with the Defendants.

"A trial court's ruling on the admissibility of evidence is subject to an abuse of discretion standard of review, but the court's decision is limited by rules of evidence and the applicable case law." *Moultrop v. GEICO Gen. Ins. Co.*, 304 So. 3d 1, 6 (Fla. 4th DCA 2020) (quoting *Horwitz v. State*, 189 So. 3d 800, 802 (Fla. 4th DCA 2015)). "If reasonable [persons] could differ as to the propriety of the action taken by the trial court, then the action is not unreasonable and there can be no finding of an abuse of discretion." *Canakaris v. Canakaris*, 382 So. 2d 1197, 1203 (Fla. 1980).

It has been long-settled case law in this state that "[a] stipulation properly entered into and relating to a matter upon which it is appropriate to stipulate is binding upon the parties and upon the Court." *Delgado v. Agency for Health Care Admin.*, 237 So. 3d 432, 436 (Fla. 1st DCA 2018) (quoting *Gunn Plumbing, Inc. v. Dania*, 252 So. 2d 1, 4 (Fla. 1971)).

However, going back to 1951, the Florida Supreme Court stated generally: "[T]he stipulation in each and every instance must be carefully examined to determine whether the language used actually discloses a clear, positive and definite stipulated fact. An ambiguous, vague statement will not, and a word used loosely might not, meet the test." *Troup v. Bird*, 53 So. 2d 717, 721 (Fla. 1951).

"Pretrial stipulations are interpreted using the same principles for interpreting written contracts." *Wiener v. The Country Club at Woodfield, Inc.*, 254 So. 3d 488, 491 (Fla. 4th DCA 2018). "[A] 'meeting of the minds' by the parties is essential to a stipulation." *McGoey v. State*, 736 So. 2d 31, 34 (Fla. 3d DCA 1999). "When construing stipulations, a court should attempt to interpret it in line with the apparent intent of the parties." *Wiener*, 254 So. 3d at 492 (quoting *Utopia Provider Sys., Inc. v. Pro-Med Clinical Sys., LLC*, 196 So. 3d 557, 561 (Fla. 4th DCA 2016)).

> A stipulation . . . must be carefully examined to determine whether the language used actually discloses a clear, positive, and definite stipulated fact. The statement should not be vague or ambiguous. Nevertheless, it should receive a construction in harmony with the apparent intention of the parties. *It is not to be construed technically, but rather in accordance with its spirit, in furtherance of justice, in the light*

4

> *of the circumstances surrounding the parties, and in view of the result that they were attempting to accomplish.* 2 Fla. Jur. 2d, *Agreed Case and Stipulations*, § 6; *see Federal Land Bank of Columbia v. Brooks*, 139 Fla. 506, 190 So. 737 (Fla. 1939).

*Id.* (alterations and emphasis in original) (quoting *Travelers Ins. Co. v. VES Serv. Co.*, 576 So. 2d 1349, 1350 (Fla. 1st DCA 1991)). If a stipulation may be reasonably interpreted as having more than one meaning, then it is ambiguous. *See Prime Homes, Inc. v. Pine Lake, LLC*, 84 So. 3d 1147, 1151 (Fla. 4th DCA 2012).

Turning to the case at hand, we note from the outset that neither party challenges the trial court's denial of the notice of withdrawal, so the propriety of that ruling is not before this court. Instead, we review the trial court's allowance of testimony pertaining to the pretrial stipulations, and we determine that the trial court did not abuse its discretion.

As discussed, the problematic phrases are "due to direct or indirect contact with the flatbed" and "as a result of direct or indirect contact with the flatbed." More specifically—in hindsight—the parties had a conflict as to the meaning of "direct or indirect contact."

Indeed, this phrase is capable of more than one reasonable meaning. In short, the phrase could mean that the decedent suffered a fatal injury because the flatbed contacted his person directly, or because it contacted his vehicle and something else inside the vehicle directly contacted the decedent's person and caused the injury, as argued by the Plaintiff. Alternatively, "indirect contact with the flatbed" could mean that the decedent's vehicle's contact with the flatbed caused a rapid deceleration that caused a Dale Earnhardt-type injury, as argued by the Defendants. Consequently, an ambiguity existed.

Given the ambiguity, the trial court was required to attempt to construe the ambiguity consistently with the parties' intent. The available "evidence" of the parties' intent—the pretrial stipulation and the expert deposition testimony—does not reveal a singular or clear intent with respect to the phrases. As agreed to in the parties' arms-length joint pretrial stipulation, other than damages, the issues to be determined at trial were whether either Defendant "place[d] the underride guard on the market with a defect that was a legal cause of the death of" the decedent, whether there was negligence on the part of either Defendant "that was a legal cause of the death of" the decedent, and whether there was "negligence on the part of [the decedent] that was a legal cause of death of [the decedent]." Because the issues to be determined include the phrase,

"that was a legal cause of the death of" the decedent, the stipulations could fairly be read to mean that the parties intended the "direct or indirect" contact issues to be determined by the jury.

Likewise, the expert deposition testimony does not provide definitive evidence of the parties' intent with respect to the pretrial stipulations. Dr. Rentschler, the defense expert on whom the Defendants primarily relied for their Dale Earnhardt theory, was not deposed until after the parties filed the pretrial stipulation. However, it does not appear that the Defendants merely changed their theory post-stipulation—Dr. Juste testified to the possibility of the deceleration-type injury prior to the filing of the pretrial stipulation.

Accordingly, the ambiguity remained, because no evidence clearly indicated that the parties intended one meaning or the other when they entered into the court-ordered pretrial stipulation. When an agreement is ambiguous, "the matter must be submitted to the finder of fact and extrinsic evidence may be used." *State, Dep't of Transp. v. Fla. Gas Transmission Co.*, 126 So. 3d 1095, 1101 (Fla. 4th DCA 2012) (citations and quotation marks omitted); *see also Rosario-Paredes v. J.C. Wrecker Serv.*, 975 So. 2d 1205, 1207 (Fla. 5th DCA 2008) ("When the evidence is in conflict, . . . it is the function of the jury to weigh the evidence and resolve those conflicts.").

As we held in *Palm Beach Polo Holdings, Inc. v. Broward Marine, Inc.*, 174 So. 3d 1037 (Fla. 4th DCA 2015), "[t]he Pretrial Stipulation is a powerful blueprint that enables a well-run and fair trial. . . . [that is] binding upon the parties and the court, and should be strictly enforced." *Id.* at 1039 (quotation marks and citation omitted). It is axiomatic, however, that any such stipulations be clear, positive, definitive, and unambiguous. The failure to facilitate a meeting of the minds on a pretrial agreement is perilous.

Because ambiguities within an agreement are for the finder of fact, and an ambiguity remained surrounding the meaning of "direct or indirect contact," the trial court did not act unreasonably in allowing the jury to hear evidence pertaining to the potential meaning of those phrases. Consequently, the trial court did not abuse its discretion, and we affirm.

The remaining arguments raised are meritless, so we affirm on those points as well.

*Affirmed.*

6

LEVINE and KUNTZ, JJ., concur.

* * *

***Not final until disposition of timely filed motion for rehearing.***